■    In the Matter of JERROLD GERTZ et al., Appellants, v TAX COMMISSION OF THE CITY OF NEW YORK et al., Respondents.—In a consolidated tax certiorari proceeding to review assessments on petitioners' real property for the tax years 1972/1973 through 1977/1978, petitioners appeal from so much of a judgment of the Supreme Court, Queens County, dated April 18, 1978, as failed to reduce the assessed valuations on a parcel of property to the values claimed by the petitioners. Judgment affirmed insofar as ap-

pealed from, with costs. No opinion. O'Connor, J. P., Mangano and Gulotta, JJ., concur.

Lazer, J., dissents and votes to modify the judgment, with the following memorandum: This consolidated tax certiorari proceeding to review the assessments of petitioners' property in Jamaica for the six tax years 1972/1973 through 1977/1978 concerns real estate currently designated on the land map of Queens County as Lots Nos. 65 and 75 of Block No. 10151. Lot No. 65 is improved by the Gertz parking garage, a seven-story unfireproofed steel and concrete frame structure erected in 1971 which is open on three sides and has a 720-car capacity. Lot No. 75 is adjacent to the garage and is improved with a taxpayer-type structure which was erected in 1972 and accommodates 10 retail stores. For the first three years under review, 1972/1973, 1973/1974 and 1974/1975, the entire parcel was held by one entity and was assessed as Lot No. 65. In the final three years, 1975/1976, 1976/1977 and 1977/1978, Lot No. 65 was divided into two lots designated Lots Nos. 65 and 75, each of which was separately owned and assessed. This appeal is from a determination at Special Term fixing the assessment of Lot No. 65 for the years 1972/1973 through 1977/1978 and Lot No. 75 for the years 1972/1973 through 1974/1975. The assessment of Lot No. 75 for the years 1975/1976 through 1977/1978 is not a subject of this appeal. The fundamental issue is the value of the garage property. The assessments under review for the years in question were as follows:

| "Lot 65 | Tax Year | Land | Building | Total |
|---|---|---|---|---|
| [combined | 1972/73 | $1,040,000 | $1,715,000 | $2,755,000 |
| with Lot 75] | 1973/74 | 1,100,000 | 2,400,000 | 3,500,000 |
| | 1974/75 | 1,100,000 | 2,400,000 | 3,500,000 |
| [garage] | 1975/76 | 285,000 | 1,715,000 | 2,000,000 |
| | 1976/77 | 285,000 | 1,715,000 | 2,000,000 |
| | 1977/78 | 285,000 | 1,715,000 | 2,000,000 |
| | | | | |
| Lot 75 | | | | |
| | | | | |
| [taxpayer- | 1975/76 | 815,000 | 685,000 | 1,500,000 |
| not under | 1976/77 | 815,000 | 685,000 | 1,500,000 |
| review on | 1977/78 | 815,000 | 685,000 | 1,500,000" |
| this appeal] | | | | |

After trial, Special Term fixed the assessments for the properties here under review as follows:

| "Lot 65 | Year | Land | Building | Total |
|---|---|---|---|---|
| [combined | 1972/73 | $1,040,000 | $1,311,000 | $2,351,000 |
| with Lot 75] | 1973/74 | 1,100,000 | 1,932,000 | 3,032,000 |
| | 1974/75 | 1,100,000 | 1,932,000 | 3,032,000 |
| [garage] | 1975/76 | 285,000 | 1,538,000 | 1,823,000 |
| | 1976/77 | 285,000 | 1,538,000 | 1,823,000 |
| | 1977/78 | 285,000 | 1,538,000 | 1,823,000 |
| Lot 75 | | | | |
| | | | | |
| [taxpayer- | 1975/76 | 815,000 | 350,000 | 1,165,000 |
| not under | 1976/77 | 815,000 | 350,000 | 1,165,000 |
| review on | 1977/78 | 815,000 | 350,000 | 1,165,000" |
| this appeal] | | | | |

The majority has voted to affirm. On the basis of this record, I am constrained to voice my dissent because I believe the true values are

substantially lower than those fixed at Special Term. At the trial, the experts for both sides agreed that the proper method of valuing the garage improvement was by capitalization of the fair net rental income that the property would produce. Such net rental income was arrived at by subtracting operating expenses from total revenues. The experts differed substantially in their view of the revenue that the garage was capable of producing. In estimating parking revenues, petitioners' expert, Gottesman, relied upon the actual patronage history of the garage, utilizing the actual rates charged for monthly parkers, and adopting a slightly higher rate for hourly customers than petitioners actually charged. Gottesman, a partner in a company which owns and operates 135 parking parking garages in the country, including 90 in the New York area, was of the opinion that at the time of his appraisal the garage was being operated in a manner which attracted the maximum number of Gertz patrons. In Gottesman's view, the fact that transient parkers were being charged a slightly higher rate than that charged at City Garage No. 6 did not discourage patronage. Gottesman placed the estimated income of the garage for 1977/1978 at $267,000, which was the equivalent of a per space rental of approximately $370 annually, or $30 monthly. In his opinion, the average estimated income for the highest year, 1976/1977, was $294,202, which amounted to a per space rate of $408 annually, or $34 monthly. Petitioners' other expert, Panzer, arrived at a value for the garage property by capitalizing the rent that a garage operator would pay to the owner on a lease of the property for public garage use. Panzer established that rental by utilizing the actual income and expenses of operating the garage as estimated by Gottesman and the following net rental values before depreciation and payment of real estate taxes:

| | |
|---|---|
| "January 25, 1972 | $200,117 |
| January 25, 1973 | $200,117 |
| January 25, 1974 | $199,796 |
| January 25, 1975 | $191,089 |
| January 25, 1976 | $166,180 |
| January 25, 1977 | $144,804" |

Panzer then applied a capitalization rate of 11% plus a real estate rate of 7.24% for the period of 1972/1973 through 1975/1976, and 12% plus 8.77%, respectively, for the remaining two-year period, and arrived at the following estimates of value:

"LOT 65 (Old)

| YEAR | | LAND | BUILDING | TOTAL |
|---|---|---|---|---|
| 1972/73 | (Garage) | $180,000 | $920,000 | $1,100,000 |
| | (Vacant) | 630,000 | — | 630,000 |
| 1973/74 | (Garage) | 180,000 | 920,000 | 1,100,000 |
| | (Taxpayer) | 630,000 | 300,000 | 930,000 |
| 1974/75 | (Garage) | 180,000 | 920,000 | 1,100,000 |
| | (Taxpayer) | 630,000 | 300,000 | 930,000 |

LOT 65 (New) (Garage)

| | | LAND | BUILDING | TOTAL |
|---|---|---|---|---|
| 1975/76 | | 180,000 | 920,000 | 1,100,000 |
| 1976/77 | | 180,000 | 570,000 | 750,000 |
| 1977/78 | | 180,000 | 570,000 | 750,000 |

LOT 75 (Taxpayer)

| | | | |
|---|---|---|---|
| 1975/76 | 630,000 | 300,000 | 930,000 |
| 1976/77 | 630,000 | 200,000 | 830,000 |
| 1977/78 | 630,000 | 200,000 | 830,000" |

Fasanella, the city's expert, testified that he believed that the garage facility would produce a net rental from the garage operator to the owner of $394,200, plus operating expenses of $114,130, an aggregate gross to the owner of $508,330 per year. That figure is equivalent to a per space rental of $706 annually or $58.83 monthly. Fasanella offered no meaningful foundation for his income estimates, however. The "comparable" garages on which he relied for his estimates were located in other neighborhoods of Queens and the comparison with the Gertz facility is highly questionable. Furthermore, according to Gottesman's testimony, the actual gross parking revenue in City Garage No. 6 (a 606-space municipal garage located immediately to the east of the subject site and more closely comparable to the Gertz facility than the garages named by Fasanella) was $13 per space per month during the years 1974-1976. This amounts to $157 to $160 annually. Fasanella's ultimate estimate of a gross revenue of $58.83 monthly per space thus seems ludicrous, particularly since his written appraisal and his trial testimony are barren of supporting facts or reasoning; for a three-month rental the adjacent city owned parking garage charged $45 while petitioners charged $25 per month. In his testimony, Fasanella insisted on appraising the garage and the taxpayer parcels as a single unit. He combined the income and the expenses for the two properties and capitalized the resulting net income into one value which he then apportioned in the same proportion as the separate assessment of those two properties for the years 1975 through 1978 when the properties were assessed in two separate lots. Fasanella utilized a capitalization rate of 10% added to the tax rate for a total rate of 17.5498% in arriving at the following valuations:

| "Lot 65 | Year | Land | Building | Total |
|---|---|---|---|---|
| | 1972/73 | $1,155,000 | $1,560,000 | $2,715,000 |
| | 1973/74-1974/75 | 1,155,000 | 2,115,000 | 3,270,000 |
| | 1975/76-1977/78 | 310,000 | 1,560,000 | 1,870,000 |
| Lot 75 | 1975/76 | 845,000 | 555,000 | 1,400,000 |
| | 1976/77 | 845,000 | 555,000 | 1,400,000 |
| | 1977/78 | 845,000 | 555,000 | 1,400,000" |

Review of the record establishes that petitioners' experts—far superior in qualifications and background—based their valuations on the actual income and expenses of the garage as it was operated and, unlike the testimony and report of the city's expert, which were conclusory and devoid of convincing data, their reports and testimony were supported by explicit details. Nevertheless, the determination appealed from resulted in assessments which were much closer to the city's estimates of value than to those of the petitioners. It is well settled that a trier of fact is not bound by the opinion of an expert witness (*Matter of City of New York [Oceanview Terrace]*, 42 NY2d 948; *Matter of City of New York [A. & W. Realty Corp.]*, 1 NY2d 428, 432; *Commercial Cas. Ins. Co. v Roman*, 269 NY 451, 456) and that the weight to be given to opinion evidence is for the determination of the trier (*Commercial Cas. Ins. Co. v Roman, supra; Coates v Peterson & Sons*, 48 AD2d 890; *Matter of Sebring*, 238 App Div 281). Despite this discretion,

however, findings in a real property valuation case may not be predicated solely and simply on the subjective judgment of the Judge or court *(Matter of City of New York [Oceanview Terrace], supra; Matter of City of New York [A. & W. Realty Corp.], supra).* This does not mean, however, that an award may never be higher or lower than the experts' estimates of value; it is only requisite that there be evidence at hand to support the value actually found by the court *(Matter of City of New York [A. & W. Realty Corp.], supra).* Here, the trial court's findings fall between the respective valuations given by the experts for both the city's estimate of $58.83 per month income per space and the petitioners' estimate of $34.05 per space monthly, but it is obvious that much more weight was given to the testimony of the city's appraiser than those of the petitioners. In my view, the evidence adduced entitles the petitioners to more relief than was granted at Special Term. Notwithstanding testimony by petitioners' experts that the property declined in value during the six-year period in issue, and despite actual city assessments and testimony by the city's expert witness maintaining constant values for the land during the same time period, the court found the value of the garage property increased during the years 1973/1974 and 1974/1975, and it raised the valuation for the garage property to $1,538,000 for all the years that followed. But entirely apart from the questionable basis for the increase mentioned, Fasanella's appraisal and testimony lead to the conclusion that he overvalued petitioners' property substantially. The predicate for the overvaluation, of course, was the estimate of gross rental income from the garage which, incidently, was disposed of in a single line entry in the appraisal. While petitioners argue that this cavalier treatment of a crucial issue resulted in an excess of value for the garage property ranging from $643,308 to $782,788 during the period involved, petitioners' values also may be tilted to the low side because of the insufficiency of the allowance for discounts given to Gertz customers and employees and for the element of safety in comparison to the adjacent city garage. The Gertz parking operation may have subsidized the Gertz retail operation to a greater extent than petitioners were willing to concede. Unfortunately, the city failed to shake petitioners' experts on this point and abnegated its own obligation to adduce evidence on the question. On this record, I am hard put to increase the values asserted by petitioners to a greater extent than 10%. Therefore, I respectfully voice my disagreement with the particularly learned Justice at Special Term and this court's majority. This record establishes the following values:

| "Lot 65 | Year | Total Assessment |
|---|---|---|
| [combined | 1972/73 | $2,025,000 |
| with garage] | 1973/74 | 2,375,000 |
| | 1974/75 | 2,375,000 |
| Lot 65 | 1975/76 | 1,210,000 |
| [garage only] | 1976/77 | 1,210,000 |
| | 1977/78 | 1,210,000" |

Although largely adopting petitioners' values for their years of maximum revenue, I have not reduced the valuation for the final years. Considering all of the factors involved, the conflicting contentions relative to the direction that Jamaica is taking and the income record previously established, I am not convinced that the drop in income in the last years was necessarily accompanied by a drop in the value of the property. I dissent accordingly.